# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CLEVELAND-CLIFFS BURNS
HARBOR LLC, a Delaware limited
liability company, and
CLEVELAND-CLIFFS STEEL LLC,
a Delaware limited liability company,

   Plaintiffs,

  v.

BOOMERANG TUBE, LLC, a Delaware
limited liability company,
BLACK DIAMOND CAPITAL
MANAGEMENT, L.L.C., a Delaware
limited liability company, and
PTC LIBERTY TUBULARS, LLC, a
Delaware limited liability company,

   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2022-0378-LWW

## MEMORANDUM OPINION

Date Submitted: May 2, 2023
Date Decided: September 5, 2023

Kevin M. Capuzzi & Kate Harmon, BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP, Wilmington, Delaware; Andrew G. Fiorella & Nathan H.
Boninger, BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP, Cleveland,
Ohio; *Counsel for Plaintiffs Cleveland-Cliffs Burns Harbor LLC and
Cleveland-Cliffs Steel LLC*

Joseph B. Cicero & Thomas A. Youngman, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; Jeffrey H. Zaiger & Judd Linden, ZAIGER LLC, New York, New York; *Counsel for Defendant PTC Liberty Tubulars, LLC*

David E. Ross, S. Michael Sirkin & Thomas C. Mandracchia, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Counsel for Defendant Black Diamond Capital Management, L.L.C.*

**WILL, Vice Chancellor**

Boomerang Tube, LLC was a producer of specialized tubing for oil and natural gas drilling rigs. Its business suffered alongside oil and gas prices during the height of the COVID-19 pandemic. It was unable to pay unsecured creditors, including the predecessor of Cleveland-Cliffs Burns Harbor LLC and Cleveland-Cliffs Steel LLC, which had sold Boomerang $7 million of goods.

In December 2020, an affiliate of Black Diamond Capital Management, L.L.C.—Boomerang's purported controller—initiated an auction of Boomerang's assets. According to Cleveland-Cliffs, the sale was a sham intended to place the assets out of certain creditors' reach. Notice of the auction was sent on Christmas Eve of 2020, with the sale occurring just ten days later. The purchaser, PTC Liberty Tubulars, LLC, is another Black Diamond affiliate.

Cleveland-Cliffs maintains that PTC Liberty effectively became Boomerang after the sale. PTC Liberty has the same ownership, officers, facilities, products, and customers that Boomerang once had. Conversely, Boomerang exists in name only.

Cleveland-Cliffs has now sued Boomerang, Black Diamond, and PTC Liberty on varied (and novel) legal theories to recover the $7 million Boomerang owes it. Black Diamond and PTC Liberty insist that Cleveland-Cliffs is nothing more than an unsecured creditor trying to collect from the wrong entities. But, given the shady circumstances surrounding the asset sale, that may be an oversimplification.

As described below, Black Diamond's motion to dismiss is granted in full. None of Cleveland-Cliffs' claims against Black Diamond are viable, primarily because veil piercing is unavailable. As to PTC Liberty, however, Cleveland-Cliffs' allegations support reasonably conceivable fraudulent transfer and successor liability claims. The remaining claims against PTC Liberty are dismissed.

## I.    FACTUAL BACKGROUND

Unless otherwise noted, the following facts are drawn from the plaintiffs' Verified Amended Complaint (the "Complaint") and the documents it incorporates by reference.[1]

### A.    Boomerang's Bankruptcy

Boomerang Tube, LLC ("Boomerang") is a Delaware limited liability company with its principal place of business in Texas or Missouri.[2]  Boomerang produced highly engineered oil country tubular goods for natural gas and crude oil drilling markets in the United States and Canada.[3]  On June 9, 2015, Boomerang and

---

[1] Verified Am. Compl. (Dkt. 18) ("Am. Compl."); *see In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. 2016) (explaining that the court may take judicial notice of "facts that are not subject to reasonable dispute" (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006))).

[2] Am. Compl. ¶ 12.

[3] *Id.* ¶ 20.

its affiliated debtors filed for bankruptcy.[4]  Boomerang emerged from bankruptcy under a confirmed Chapter 11 plan in January 2016.[5]

Under the Chapter 11 plan, Black Diamond Capital Management, L.L.C. ("Black Diamond") became Boomerang's majority owner.[6]  Black Diamond, a Delaware limited liability company with headquarters in Connecticut, is an alternative asset management firm specializing in high-yield credit, stressed and distressed credit, restructurings, and business turnarounds.[7]  The Chapter 11 plan also gave Black Diamond "exclusive control over the election of" a majority of the members of Boomerang's board of directors.[8]  Black Diamond appointed four of its own employees to the board, with one of its Senior Managing Directors later serving as Chairman.[9]  Black Diamond was also a senior secured creditor of Boomerang.[10]

## B.    Boomerang's Purchases from ArcelorMittal

Between June and November 2020, Boomerang conducted business with ArcelorMittal Burns Harbor LLC and ArcelorMittal USA LLC (together,

---

[4] *Id.* ¶ 21.

[5] *Id.* ¶ 23.

[6] *Id.* ¶¶ 24, 26.

[7] *Id.* ¶¶ 15, 19.

[8] *Id.* ¶ 24.

[9] *Id.* ¶ 25.

[10] *Id.* ¶ 5.

"ArcelorMittal") pursuant to a Terms & Conditions of Sale agreement (the "Terms & Conditions Agreement").[11] In total, Boomerang purchased $7,355,585.91 worth of goods from ArcelorMittal but failed to pay for certain orders and defaulted on the associated invoices (the "Unpaid Invoices").[12]

### C.  Cleveland-Cliffs' Purchase of ArcelorMittal

On or around December 9, 2020, Cleveland-Cliffs Burns Harbor LLC and Cleveland-Cliffs Steel LLC (together, "Cleveland-Cliffs") acquired ArcelorMittal.[13] ArcelorMittal's rights and accounts associated with Boomerang were transferred to Cleveland-Cliffs.[14] As such, Cleveland-Cliffs became ArcelorMittal's successor-in-interest with respect to the Terms & Conditions Agreement.[15]

Boomerang remained delinquent on the Unpaid Invoices.[16] Shortly after Cleveland-Cliffs acquired ArcelorMittal, Boomerang sought to purchase another $1.5 million of goods from Cleveland-Cliffs.[17] Boomerang indicated that it had

---

[11] *Id.* ¶¶ 30-31, 33; Am. Compl. Ex. 2.

[12] Am. Compl. ¶¶ 31, 38-40; Am. Compl. Ex. 1.

[13] Am. Compl. ¶ 41. Cleveland-Cliffs Steel is the parent company of Cleveland-Cliffs Burns Harbor. *Id.* ¶ 11.

[14] *Id.* ¶ 41.

[15] *Id.*

[16] *Id.* ¶ 43.

[17] *Id.* ¶ 44.

4

"Black Diamond[']s blessing" to do so.[18] Cleveland-Cliffs declined to sell the goods to Boomerang.[19]

### D. Boomerang's Article 9 Sale

On December 24, 2020 (Christmas Eve), Black Diamond Commercial Finance, L.L.C., as administrative agent for Boomerang's secured creditors, gave notice of a foreclosure sale under Article 9 of New York's Uniform Commercial Code (UCC).[20] Black Diamond Commercial Finance is a subsidiary of Black Diamond.[21] The notice stated that the assets of Boomerang and its affiliates would be sold in a public auction.[22] Bids were due within ten days—by Sunday January 3, 2021—and the auction would occur on January 4.[23] The notice also explained that Boomerang owed approximately $110 million "to Black Diamond Commercial Finance and an unnamed group of lenders."[24] Boomerang did not provide notice of the sale to Cleveland-Cliffs.[25]

---

[18] *Id.*

[19] *Id.*

[20] *Id.* ¶¶ 45-47; Am. Compl. Ex. 3 ("Notice").

[21] Am. Compl. ¶ 46.

[22] *Id.* ¶ 47; *see id.* ¶ 48 (stating that the sale included "all accounts, chattel paper, equipment, fixtures, general intangibles, inventory and other personal property, wheresoever located, together with the proceeds thereof" (quoting Notice at 2)).

[23] *Id.* ¶¶ 50, 52.

[24] *Id.* ¶ 47; *see* Notice at 3.

[25] Am. Compl. ¶ 53.

The public auction occurred as scheduled on January 4.[26] Two bidders appeared: 2021 Bidco I, LLC and Centric Pipe, LLC.[27] Bidco—now renamed PTC Liberty Tubulars, LLC ("PTC Liberty")—is a Delaware limited liability company with its principal place of business in Texas or Pennsylvania.[28] PTC Liberty is "an affiliate of Black Diamond."[29]

Centric Pipe initially submitted a bid.[30] But after learning that the competing bidder was affiliated with Black Diamond, Centric Pipe bowed out of the auction.[31] Bidco submitted the winning $16.5 million bid for all of Boomerang's assets.[32] The agreement between Black Diamond Commercial Finance as foreclosing seller, and Bidco as buyer, was memorialized in an Asset Purchase Agreement (the "APA").[33] Black Diamond's General Counsel executed the APA on behalf of Bidco.[34]

---

[26] *Id.* ¶ 54.

[27] *Id.* ¶ 55; Am. Compl. Ex. 4.

[28] Am. Compl. ¶¶ 14, 56.

[29] *Id.* ¶ 56.

[30] Am. Compl. Ex. 4 at 12.

[31] Am. Compl. ¶ 59.

[32] *Id.* ¶ 60.

[33] *Id.* ¶ 61; Am. Compl. Ex. 5.

[34] Am. Compl. ¶¶ 62, 79; Am. Compl. Ex. 5 at 10.

### E. PTC Liberty's Post-Sale Operations

After the foreclosure sale, Boomerang allegedly ceased to exist as anything other than a shell entity.[35] It "is no longer in good standing with the Delaware Department of State and has failed to timely pay its annual taxes."[36] It has yet to appear in this action.

PTC Liberty effectively replaced Boomerang.[37] PTC Liberty operates the two manufacturing facilities once run by Boomerang.[38] PTC Liberty has the same officers, manufactures and sells the same products to the same customers, uses the same equipment at the same facilities, and employs the same individuals as Boomerang.[39] Boomerang's former website and PTC Liberty's current website give nearly identical descriptions of the companies.[40] And, like Boomerang, PTC Liberty "remains under the ownership and control of Black Diamond and its affiliates."[41]

---

[35] Am. Compl. ¶¶ 68, 93.

[36] *Id.* ¶ 69.

[37] *Id.* ¶¶ 73-81.

[38] *Id.* ¶ 76.

[39] *Id.* ¶¶ 75, 81.

[40] *Id.* ¶ 77. For example, PTC Liberty's website proclaims that it was established in 2008— the date of Boomerang's establishment. *Id.* ¶ 78.

[41] *Id.* ¶ 79.

7

More specifically, PTC Liberty is "supervise[d] and operate[d]" by PTC Alliance, which is "owned by Black Diamond."[42]

## F.    The Demand Letter

On May 24, 2021, Cleveland-Cliffs sent a letter to Boomerang, Black Diamond, and PTC Liberty, demanding payment for the Unpaid Invoices.[43]  The parties attempted to resolve the matter.[44]  On June 9, they executed a tolling agreement that preserved all claims and defenses through August 6.[45]  The tolling period was extended until April 29, 2022, but no resolution was reached.[46]

## G.    This Litigation

On April 29, 2022, Cleveland-Cliffs filed this action against Black Diamond, PTC Liberty, and Boomerang.[47]  Black Diamond and PTC Liberty separately moved for dismissal on May 25.[48]  Boomerang, which was served with the complaint on May 6, has yet to appear.[49]

---

[42] *Id.* ¶ 80.

[43] *Id.* ¶ 82; Am. Compl. Ex. 7.

[44] Am. Compl. ¶ 83.

[45] *Id.* ¶ 84.

[46] *Id.* ¶¶ 84-87.

[47] Dkt. 1.

[48] Dkts. 7-8.

[49] *See* Dkt. 5.

On July 29, 2022, Cleveland-Cliffs filed a Verified Amended Complaint (the "Complaint") advancing six counts.[50] Count I is styled as a claim for successor liability against Black Diamond and PTC Liberty concerning Boomerang's Unpaid Invoices.[51] Count II is a fraudulent transfer claim under the Delaware Uniform Fraudulent Transfer Act (DUFTA) against all three defendants concerning Boomerang's foreclosure sale.[52] Count III seeks a declaratory judgment that Boomerang, PTC Liberty, and Black Diamond are each liable for Boomerang's obligations to Cleveland-Cliffs based on veil piercing theories.[53] Count IV is a claim against Boomerang for breach of the Terms & Conditions Agreement.[54] Count V is an unjust enrichment claim against all three defendants.[55] And Count VI seeks a declaratory judgment that Boomerang's foreclosure sale was neither commercially reasonable nor compliant with Article 9 of the New York UCC.[56]

---

[50] Dkt. 18.

[51] Am. Compl. ¶¶ 89-96.

[52] *Id.* ¶¶ 97-102.

[53] *Id.* ¶¶ 106, 103-13.

[54] *Id.* ¶¶ 114-21.

[55] *Id.* ¶¶ 122-27.

[56] *Id.* ¶¶ 128-32.

On September 23, Black Diamond and PTC Liberty each moved to dismiss the Complaint.[57] Boomerang (again) did not respond. After briefing was complete, I heard oral argument on the motions to dismiss on May 2, 2023.[58]

## II. LEGAL ANALYSIS

The defendants' motions to dismiss for failure to state a claim on which relief can be granted are governed by Court of Chancery Rule 12(b)(6). The standard that applies is as follows:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[59]

The "pleading standards for purposes of a Rule 12(b)(6) motion 'are minimal.'"[60] The "reasonable conceivability" standard a plaintiff must meet to survive a Rule 12(b)(6) motion asks only "whether there is a 'possibility' of

---

[57] Dkts. 23-24.

[58] Dkts. 42-43.

[59] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citations omitted).

[60] *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *23 (Del. Ch. May 21, 2013) (quoting *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011)).

recovery."[61]  I "must draw all reasonable inferences in favor" of the plaintiff but am "not required to accept every strained interpretation of the [plaintiff's] allegations."[62]

I begin by assessing Cleveland-Cliffs' request for veil piercing, since it affects my analysis of other claims.  After concluding that veil piercing is unavailable, I determine that Cleveland-Cliffs has stated viable claims for fraudulent transfer and successor liability against PTC Liberty.  Its remaining claims are dismissed.

## A.    Veil Piercing

In Count III of the Complaint, Cleveland-Cliffs seeks a declaratory judgment that "Boomerang, PTC Liberty, and Black Diamond are legally indistinguishable and are each equally liable for Boomerang's obligations to Cleveland-Cliffs."[63] Read literally, this assertion would involve three distinct types of veil piercing based on an agency or "alter ego" theory: (1) traditional veil piercing from Boomerang and PTC Liberty up the chain to Black Diamond; (2) reverse veil piercing down the chain from Black Diamond to Boomerang and PTC Liberty; and (3) horizontal (also called sideways or sister) veil piercing between Boomerang and PTC Liberty.  Only the first type—traditional veil piercing—is squarely addressed in Cleveland-Cliffs'

---

[61] *China Agritech*, 2013 WL 2181514, at *24 (quoting *Cent. Mortg.*, 27 A.3d at 537 n.13).

[62] *Gen. Motors (Hughes)*, 897 A.2d at 168.

[63] Am. Compl. ¶ 106.

11

brief.[64]  The Complaint also makes a vague reference to enterprise liability, which is unbriefed.[65]  Each theory is either deficient or waived.

### 1. Traditional Veil Piercing

"It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."[66]  Delaware courts depart from this general rule only in exceptional circumstances.[67]

In the parent/subsidiary context, one exception is the alter ego doctrine— where  the subsidiary and the parent "operate[] as a single economic entity such that

---

[64] *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[65] Am. Compl. ¶ 9.

[66] *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (citation omitted); *see also Nieves v. Insight Bldg. Co.*, 2020 WL 4463425, at *8 (Del. Ch. Aug. 4, 2020) ("A subsidiary corporation is presumed to be a separate and distinct entity from its parent corporation.") (citation omitted).

[67] *Paul Elton, LLC v. Rommel Delaware, LLC*, 2020 WL 2203708, at *14 (Del. Ch. May 7, 2020) ("Delaware public policy disfavors disregarding the separate legal existence of business entities."); *see also Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) ("Persuading a Delaware court to disregard the corporate entity is a difficult task."); *Verdantus Advisors, LLC v. Parker Infrastructure P'rs, LLC*, 2022 WL 611274, at *2 (Del. Ch. Mar. 2, 2022) ("Veil piercing is a tough thing to plead and a tougher thing to get, and for good reason.").

it would be inequitable for th[e] Court to uphold a legal distinction between them."[68]

Piercing the corporate veil under this doctrine "requires that the corporate structure cause fraud or similar injustice."[69] The subsidiary "must be a sham and exist for no other purpose than as a vehicle for fraud."[70]

Delaware courts consider various factors in assessing whether to disregard the corporate form, including: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder."[71] No single factor is dispositive.[72] Rather, "[a]n ultimate

---

[68] *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 707 (Del. Ch. 2021) (quoting *Mabon, Nugent & Co. v. Texas Am. Energy Corp.*, 1990 WL 44267, at *5 (Del. Ch. Apr. 12, 1990)).

[69] *Wallace*, 752 A.2d at 1184 (observing that veil piercing "requires that the corporate structure cause fraud or similar injustice" and that "[e]ffectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud" (quoting *Outokumpu Eng'g Enters., Inc. v. Kvaerner Enviropower, Inc.*, 685 A.2d 724, 729 (Del. Super. 1996))).

[70] *Wallace*, 752 A.2d at 1184; *see also In re Sunstates Corp. S'holder Litig.*, 788 A 2.d 530, 534 (Del. Ch. 2001).

[71] *Manichaean*, 251 A.3d at 706 (quoting *Doberstein v. G-P Indus., Inc.*, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015)).

[72] *Id.* at 707.

decision regarding veil-piercing is largely based on some combination of these factors, in addition to 'an overall element of injustice or unfairness.'"[73]

Only the second factor is satisfied as to Boomerang, which was left insolvent after the Article 9 sale.[74]  There are no allegations about PTC Liberty's solvency.[75]  The remaining factors are unmet.

Regarding the first and third factors, Cleveland-Cliffs has not alleged that Boomerang or PTC Liberty was "[in]adequately capitalized for the undertaking" or failed to observe corporate formalities.[76]  And other than a conclusory assertion that

---

[73] *Id.*; *see Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) ("To state a 'veil-piercing claim,' the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors."); *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at \*15 (Del. Ch. July 6, 2018) (dismissing a veil piercing claim where there were no facts supporting an inference that the corporation "exists solely as a vehicle for fraud"); *Gadsden v. Home Pres. Co.*, 2004 WL 485468, at \*4 (Del. Ch. Feb. 20, 2004, revised Mar. 12, 2004) ("A court of equity will disregard the separate legal existence of a corporation where it is shown that the corporate form has been used to perpetrate a fraud or similar injustice."); *see also United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988) ("[N]o single factor could justify a decision to disregard the corporate entity, but . . . some combination of them [is] required, and . . . an overall element of injustice or unfairness must always be present, as well."), *aff'd*, 879 F.2d 860 (3d Cir. 1989) (TABLE).

[74] Am. Compl. ¶ 67.

[75] If anything, Cleveland-Cliffs asserts otherwise.  *See id.* ¶ 76 (alleging that "PTC Liberty now operates . . . two manufacturing plants").

[76] *Manichaean*, 251 A.3d at 706.  At oral argument, counsel for Cleveland-Cliffs conceded that corporate formalities were likely observed.  Tr. of Oral Arg. on Defs.' Mots. to Dismiss (Dkt. 43) ("Hr'g Tr.") 73 ("I would suspect, given the counsel that's here and the counsel that was representing the companies, that all corporate formalities were observed.  I think there's no question about that.").

14

Black Diamond was "on both sides of the purported sale transaction," there is no allegation that Black Diamond siphoned funds from Boomerang or PTC Liberty (the fourth factor).[77]

Cleveland-Cliffs also falls short of satisfying the fifth factor. With respect to Boomerang, Cleveland-Cliffs avers that Black Diamond was Boomerang's "majority owner" and appointed four of its employees to Boomerang's seven-member board.[78] But "[a] parent corporation is not liable for the acts of its subsidiary merely because it owns (and votes) a majority of the subsidiary's stock or shares common shareholders, directors or officers with the subsidiary."[79] As to PTC Liberty, the fact that Black Diamond's General Counsel was PTC Liberty's representative and signatory on the APA is insufficient to support an inference that the two entities are alter egos.[80] It is a "well established principle [of corporate law]

---

[77] Am. Compl. ¶ 5. This assertion yields a circular argument: Black Diamond was not on either side of the Article 9 sale unless the separate corporate existences of the entities are ignored. At argument, Cleveland-Cliffs averred that the siphoning factor is met because Black Diamond purportedly put its secured debt ahead of other creditors. Hr'g Tr. 73. Even if the allegations in the Complaint could be read to support this contention, the balance of factors would still weigh against veil piercing.

[78] Am. Compl. ¶¶ 5, 24.

[79] *Wenske*, 2018 WL 5994971, at *6 ("Nor will conclusory allegations that the parent's management exclusively dominated and controlled the subsidiary's management suffice to state a claim for veil-piercing.").

[80] *See* Am. Compl. ¶¶ 62, 79; APA § X.3. Cleveland-Cliffs' allegation that "*PTC Liberty* has the same ownership, the same officers, manufactures and sells the same products to the same customers, uses the same equipment at the same facilities, and uses the same

15

that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership."[81]   Black Diamond does not even directly oversee PTC Liberty's business.  Rather, PTC Alliance "supervise[s] and operate[s] PTC Liberty."[82]  Black Diamond, in turn, "own[s]" PTC Alliance.[83]

On balance, these factors weigh against viewing Black Diamond as a single economic entity with Boomerang or PTC Liberty.  But even if it were reasonably conceivable that Cleveland-Cliffs could satisfy certain factors, its own allegations subvert the notion that Black Diamond is indistinguishable from PTC Liberty or Boomerang.  At the parent level, Cleveland-Cliffs describes Black Diamond as an alternative asset management firm based in Connecticut.[84]  At the subsidiary level, Boomerang and PTC Liberty purportedly operate tubular goods businesses from a Texas location and have manufacturing facilities, employees, products, and customers.[85]  These facts not only belie any inference that Boomerang or PTC

---

employees previously used by *Boomerang*" is irrelevant to veil piercing vis-à-vis these entities and *Black Diamond*.  Am. Compl. ¶ 75 (emphasis added).

[81] *Bestfoods*, 524 U.S. at 69 (citation omitted).

[82] Am. Compl. ¶ 80.

[83] *Id.*

[84] *Id.* ¶¶ 15, 19.

[85] *Id.* ¶¶ 7, 75-76.  The allegation that Boomerang sought to purchase an additional $1.5 million worth of goods from Cleveland-Cliffs with "Black Diamond[']s blessing" is another acknowledgement of Black Diamond and Boomerang's separateness.  *Id.* ¶ 44.

Liberty functioned as a single economic entity with Black Diamond.[86] They also make it unreasonable to infer that Boomerang or PTC Liberty are sham entities.[87]

In terms of the fraud or injustice inquiry, Cleveland-Cliffs' contentions center on the Article 9 sale that it claims was a fraudulent transfer.[88] The fraud or injustice must, however, "come from an inequitable use of the corporate form itself as a sham, and not from the underlying claim."[89] "To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping."[90]

---

[86] *See Altabef v. Neugarten*, 2021 WL 5919459, at *12 (Del. Ch. Dec. 15, 2021) (rejecting a conclusory alter ego allegation where the plaintiff acknowledged that the company had actual business operations).

[87] *See Crosse*, 836 A.2d at 497 ("[T]he plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors.") (citation omitted).

[88] *See* Pls.' Combined Answering Br. in Opp'n to Defs.' Mots. to Dismiss (Dkt. 30) ("Pls.' Answering Br.") 54-55 ("Black Diamond abused the corporate form by transferring assets between two of its affiliate entities[.]").

[89] *EBG Hldgs. LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *12 (Del. Ch. Sept. 2, 2008); *see also Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical*, 2004 WL 415251, at *4 (Del. Ch. Mar. 4, 2004) (explaining that the plaintiff must allege facts showing "that the corporate form in and of itself operates to serve some fraud or injustice, distinct from the alleged wrongs").

[90] *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989); *see also Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1305 (D. Del. 1990) ("[T]he alleged fraud or inequity must be distinct from the tort alleged in the complaint."); *Yu v. GSM Nation, LLC*, 2017 WL 2889515, at *4 (Del. Ch. July 7, 2017) (characterizing an alter ego veil piercing claim brought in parallel to a viable DUFTA claim as an "attempt to bootstrap a legal claim into the Court of Chancery's jurisdiction through the 'invocation of familiar chancery terms'") (citation omitted).

17

Thus, Black Diamond cannot be held liable for the Unpaid Invoices through veil piercing. Cleveland-Cliffs has failed to demonstrate that Black Diamond functions a single economic entity with Boomerang or PTC Liberty. If anything, the Complaint suggests the opposite. It has also not shown that Boomerang or PTC Liberty exists solely to perpetrate fraud.

### 2. Other Veil Piercing Theories

Cleveland-Cliffs does not explicitly seek to recover based on reverse or horizontal veil piercing or enterprise liability. These theories were unbriefed and therefore waived.[91] Regardless, each would fail on the merits.

"The natural starting place when reviewing a claim for reverse veil-piercing are the [five] traditional factors Delaware courts consider when reviewing a traditional veil-piercing claim."[92] "The court should then ask whether the owner is utilizing the corporate form to perpetuate fraud or an injustice."[93] Horizontal veil piercing and enterprise liability—which have not been adopted in Delaware—would seemingly also require a prerequisite finding of traditional veil piercing.[94] Because

---

[91] *See Emerald P'rs*, 726 A.2d at 1224.

[92] *Manichaean*, 251 A.3d at 714.

[93] *Id.* at 714-15 (describing additional factors to consider in reverse veil piercing).

[94] *See* 1 William Meade Fletcher et al., Fletcher Cyc. Corps. § 43 (perm. ed., rev. vol. 2022), Westlaw (database updated Sept. 2022) ("If sister entities share common shareholders, owners, or parents, 'horizontal veil piercing' might be allowed if the veils separating each entity from the parent or common owners are first pierced to find that each sister entity is the alter ego of its owners."); *see also* David J. Marchitelli, *Disregard of*

Cleveland-Cliffs has not pleaded a viable basis for traditional veil piercing, these other theories are likewise defective.

## B. Fraudulent Transfer

In Count II of the Complaint, Cleveland-Cliffs asserts that Boomerang, Black Diamond, and PTC Liberty are liable for a fraudulent transfer under DUFTA. Specifically, it advances constructive fraudulent transfer and actual fraudulent transfer theories against Boomerang (the transferor) and PTC Liberty (the transferee).[95] Cleveland-Cliffs further alleges that Black Diamond is liable as a transfer beneficiary under Section 1308(b)(1).[96]

---

*Separate Existence of Corporations Under Single Business Enterprise Theory*, 50 A.L.R. 7th art. 2 (2020), Westlaw (database updated weekly) (discussing case law); *Sentry Supply Inc. v. NLMK N. Am. Plate LLC*, 2019 WL 1388793, at *5 (W.D. La. Mar. 27, 2019) ("Delaware has not adopted the single business enterprise doctrine as a means of piercing the corporate veil."); *cf. Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1043 n. 59 (Del. Ch. 2006) ("As I understand the tests for enterprise liability used in some states, they are not markedly more certain than the traditional veil piercing or alter ego inquiries.") (citation omitted).

[95] Am. Compl. ¶¶ 99-101. Constructive fraudulent transfer is codified at 6 *Del. C.* §§ 1304(a)(2), 1305(a), and 1305(b). Actual fraudulent transfer is codified at 6 *Del. C.* § 1304(a)(1).

[96] *Id.* ¶¶ 6-7. A careful read of the Complaint reveals hints of a constructive fraudulent transfer claim under Section 1305(b). *Id.* ¶ 101(e). This provision of the statute "renders a preferential transfer—i.e., a transfer by an insolvent debtor for or on account of an antecedent debt—to an insider vulnerable as a fraudulent transfer when the insider had reasonable cause to believe that the debtor was insolvent." *Wilm. Sav. Fund Soc., FSB v. Kaczmarczyk*, 2007 WL 704937, at *7 (Del. Ch. Mar. 1, 2007) (citation omitted). Cleveland-Cliffs makes no mention of any such claim in its brief, thereby waiving it. *See Emerald P'rs*, 726 A.2d at 1224. Regardless, Boomerang is not alleged to owe any antecedent debt to PTC Liberty. *See Kaczmarczyk*, 2007 WL 704937, at *8 ("[T]he phrase

As a threshold matter, it is reasonably conceivable that the Article 9 sale was a transfer under DUFTA. Cleveland-Cliffs has sufficiently pleaded constructive fraudulent transfer (under Sections 1304(a)(2) and 1305(a)) and actual fraudulent transfer (under Sections 1304(a)(1)) claims against PTC Liberty. Its transfer beneficiary claim against Black Diamond, however, is dismissed.

### 1. Qualifying "Transfers" of "Assets"

DUFTA applies to "transfers," which are defined by the statute as "every mode . . . of disposing of or parting with an asset or an interest in an asset."[97] An "asset" is "property of a debtor," but excludes "[p]roperty to the extent it is encumbered by a valid lien."[98] And a "valid lien" "means a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings."[99] Thus, for a transaction to qualify as a "transfer" of "assets" under DUFTA, the value of the transferred property must exceed the value of any valid liens.[100]

---

'antecedent debt' in section 1305(b) . . . refer[s] to a debt owed by the transferor to the insider transferee.").

[97] 6 *Del. C.* § 1301(12).

[98] *Id.* § 1301(2)(a).

[99] *Id.* § 1301(13).

[100] *See Rsrvs. Mgmt. Corp. v. 30 Lots, LLC*, 2009 WL 4652991, at *5 (Del. Super. Nov. 30, 2009) (concluding that because the "mortgage lien was valid and exceeded the value of the property, the lots [we]re not an 'asset'" and the "mortgage foreclosure sale was not . . . a 'transfer' by the debtor that the Act recognizes"); *see also In re Valente*, 360 F.3d 256, 260 (1st Cir. 2004) (holding that because a "property was only worth $150,000 but

PTC Liberty argues that Boomerang's foreclosure sale is not a qualifying "transfer" of "assets."[101] It avers that Boomerang's assets were encumbered by $126 million in valid liens, including $110 million owed pursuant to a term credit agreement and $16 million owed to a bank.[102] But to dismiss the claim on this basis would require me to reject well-pleaded allegations in the Complaint and draw inferences against Cleveland-Cliffs. At present, I can do neither.[103]

Cleveland-Cliffs has sufficiently pleaded that the value of the transferred assets exceeds $126 million. The Complaint includes allegations that Boomerang's inventory and raw goods were worth $27.5 million, that its Liberty, Texas plant housed $100 million worth of equipment, and that its Houston, Texas plant held state-of-the art equipment of unspecified value.[104] Cleveland-Cliffs also avers that

was encumbered by a $168,000 first mortgage, as well as a number of state and federal tax liens, it did not qualify as an 'asset' under the UFTA at the time of the transfer"); *Mussetter v. Lyke*, 10 F. Supp. 2d 944, 958 (N.D. Ill. 1998) ("Uniform case law confirms the self-evident proposition that the unencumbered portion of a debtor's property is an 'asset' for UFTA purposes."), *aff'd*, 202 F.3d 274 (7th Cir. 1999). The "DUFTA is modeled on UFTA [Uniform Fraudulent Transfer Act], a uniform act, [so] the decisions of other jurisdictions interpreting the same (or substantially similar) model statutes [are appropriate] guidance." *Burkhart v. Genworth Fin., Inc.*, 275 A.3d 1259, 1270 (Del. Ch. 2022).

[101] Def. PTC Liberty Tubular, LLC's Opening Br. in Supp. of Mot. to Dismiss (Dkt. 24) ("PTC Liberty's Opening Br.") 13-17.

[102] Notice at 2-3; Am. Compl. ¶ 65.

[103] *See Savor*, 812 A.2d at 896-97.

[104] Am. Compl. ¶¶ 28-29, 64.

during the bankruptcy proceeding, Boomerang was valued at over $300 million.[105]

Based on these facts, it is reasonably conceivable that the value of the assets sold during the Article 9 sale exceeded that of any valid liens.[106]

### 2. Constructive Fraudulent Transfer

Sections 1304(a)(2) and 1305(a) provide causes of action for constructive fraudulent transfer.[107] To state a claim under either provision, a plaintiff must allege "(i) that the transferor failed to receive reasonably equivalent value for the asset transferred; and (ii) that the transferor was insolvent at the time of the transfer, or was rendered insolvent by the transfer."[108] Cleveland-Cliffs is not required to plead

---

[105] *Id.* ¶ 64.

[106] Further factual development is necessary to determine the value of the assets. *Cf. Ryan Racing, LLC v. Gentilozzi*, 2015 WL 728468, at *9 (W.D. Mich. Feb. 19, 2015) (denying summary judgment where "[t]here [we]re significant factual disputes concerning which loans to consider and what value should be ascribed to [the transferred] assets").

[107] The difference between DUFTA Sections 1304(a)(2) and 1305(a) is that the latter "provides a cause of action only to present creditors." *Quadrant Structured Prod. Co. v. Vertin*, 102 A.3d 155, 195 (Del. Ch. 2014); *see also CIBC Bank USA v. JH Portfolio Debt Equities, LLC*, 2021 WL 2230976, at *11 (Del. Super. June 2, 2021). Otherwise, the two sections are essentially identical. *See In re Mobilactive Media, LLC*, 2013 WL 297950, at *30 (Del. Ch. Jan. 25, 2013) (discussing 6 *Del. C.* § 1305(a)); *Burkhart v. Genworth Fin., Inc.*, 250 A.3d 842, 854-55 & n.81 (Del. Ch. 2020) (discussing 6 *Del. C.* § 1304(a)(2)).

[108] *In re Samson Res. Corp.*, 2023 WL 4003815, at *24 (Bankr. D. Del. June 14, 2023) (citing 6 *Del. C.* §§ 1304(a)(2), 1305(a)).

these elements with particularity.[109]  Rather, the claim is subject to the more lenient Rule 8(a) notice pleading standard.[110]

The defendants do not dispute that the second element—insolvency of the transferor at the time of or due to the transfer—is met.  Nor could they.  "A debtor who is generally not paying debts as they become due is presumed to be insolvent."[111]  Before its foreclosure sale, Boomerang defaulted on the Unpaid Invoices and it remains in default.[112]  The foreclosure sale was prompted by Boomerang defaulting on its loans.[113]  After the sale, Boomerang allegedly "ceased to exist."[114]

Regarding the first element, Cleveland-Cliffs adequately pleads that the foreclosure failed to net Boomerang a "reasonably equivalent" value for "the assets

---

[109] *Cf. Renco Grp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2015 WL 394011, at *10 (Del. Ch. Jan. 29, 2015) ("Although this is a notice pleading jurisdiction, Chancery Court Rule 9(b) requires a plaintiff to 'plead fraud with particularity' [for an actual fraudulent transfer claim].").

[110] *See Ki-Poong Lee v. So*, 2016 WL 6806247, at *5 (Del. Super. Nov. 17, 2016) (explaining that constructive fraud claims only require the plaintiff to plead "a short and plain statement of the claim" demonstrating its entitlement to relief); *Renco Grp*, 2015 WL 394011, at *10 ("[A] plaintiff can focus on an inadequate exchange [i.e., a constructive fraudulent transfer claim], in which fraudulent intent is presumed.").

[111] 6 *Del. C.* § 1302(b).

[112] Am. Compl. ¶¶ 38, 82-88.

[113] APA at Recitals.

[114] Am. Compl. ¶ 67; *see id.* ¶¶ 68-72.

transferred."[115]  Cleveland-Cliffs alleges that the assets Bidco (i.e., PTC Liberty) bought in the foreclosure sale were worth over $100 million and that Boomerang's "outstanding debt obligations" were not assumed through the purchase.[116]  In exchange, PTC Liberty paid $16.5 million.[117]  If true, this is obviously a significant disparity in value.[118]

The assets purchased by PTC Liberty came encumbered with security interests.[119]  And a below market price is not unusual in a foreclosure sale.[120]  But

---

[115] *Id.* ¶ 101(c).

[116] *Id.* ¶¶ 64(b), 74; *see* APA § I.2 (providing that Bidco/PTC Liberty did not "assume or become responsible for any liabilities or obligations").

[117] Am. Compl. ¶ 60.

[118] *See In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2018 WL 3120804, at *20 (Del. Ch. June 25, 2018) (concluding that a lack of reasonably equivalent value was adequately pleaded where assets worth $50 million were sold for $6 million); *see also Quadrant*, 102 A.3d at 199-200 (concluding that the payment of service fees exceeding market rates by $5 to $7 million annually in return for a diminished scope of service supported a reasonable inference that the value exchanged was not reasonably equivalent); *Mobilactive Media*, 2013 WL 297950, at *31 (noting that the exchange of assets worth $72,920,00 for a deed of indemnity made it reasonably conceivable that the exchange was not reasonably equivalent).

[119] APA § IV.c ("The Foreclosing Seller has not waived any of its rights with respect to, or released any of the collateral currently in the possession or control of the Grantors securing, any obligations of the Borrower under the Loan Documents[.]").

[120] *See BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 531 (1994) (holding that "reasonably equivalent value" under the federal fraudulent transfer statute was not "fair market value" because "fair market value presumes market conditions that, by definition, do not obtain in the forced-sale context, since property sold within the time and manner strictures of state-prescribed foreclosure is simply worth less than property sold without such restrictions").

whether the encumbrances or the circumstances of a foreclosure sale affected the value of Boomerang's assets is a factual question that I cannot presently resolve.[121]

Accordingly, I decline to dismiss the constructive fraudulent transfer claim against PTC Liberty under Sections 1304(a)(2) and 1305(a).[122]

### 3. Actual Fraudulent Transfer

Section 1304(a)(1) provides a cause of action for actual fraudulent transfer where "the debtor made the transfer . . . [w]ith actual intent to hinder, delay or defraud any creditor of the debtor."[123] To plead a claim under this provision, a plaintiff must meet the particularity standard of Rule 9(b) by pleading "specific supporting facts describing the circumstances of the transfer," such as the who, what,

---

[121] *See In re Image Worldwide, Ltd.*, 139 F.3d 574, 576 (7th Cir. 1998) ("Whether 'reasonably equivalent value' was received in a transaction is a question of fact."); *see also Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997) ("We have held that the formula for determining reasonably equivalent value is not a fixed mathematical formula; rather, the standard for '[r]easonable equivalence should depend on all the facts of each case,' an important element of which is fair market value. Another important factor in assessing reasonably equivalent value is whether the sale was 'an arm's length transaction between a willing buyer and a willing seller.'" (quoting *In re Bundles*, 856 F.2d 815, 824 (7th Cir. 1988))).

[122] This claim also survives against Boomerang, which is in default.

[123] 6 *Del. C.* § 1304(a)(1). "The 'intent' that must be established under section 548(a) [the federal equivalent of DUFTA Section 1304(a)(1)] is the *debtor's* actual fraudulent intent." *In re Park S. Sec., LLC.*, 326 B.R. 505, 517 (Bankr. S.D.N.Y. 2005) (citation omitted); *see also Seiden v. Kaneko*, 2015 WL 7289338, at *13 (Del. Ch. Nov. 3, 2015) (reciting 6 *Del. C.* § 1304(a)(1)). That is, Boomerang's intent is at issue.

and when of the challenged transfer.[124]  Intent, though, "may be averred generally."[125]

Cleveland-Cliffs describes the circumstances of the transfer with the requisite specificity.  The Complaint details the parties to the transfer, the transferred assets, the nature of the notice and bidding process, and the date of the transfer.[126]

The Complaint also sets out multiple facts making it reasonably conceivable that Boomerang had a fraudulent intent.  Section 1304(b) provides a "nonexhaustive" list of factors that may be considered in finding "actual intent" for purposes of Section 1304(a)(1).[127]  "The confluence of several of these factors,

---

[124] *Ki-Poong Lee*, 2016 WL 6806247, at *4; *see also Trusa v. Nepo*, 2017 WL 1379594, at *11 (Del. Ch. Apr. 13, 2017) ("A claim for fraudulent transfer also must comport with Rule 9(b) and be pled with particularity."); *Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *7 (Del. Ch. Dec. 23, 2008) ("To satisfy Rule 9(b), a complaint must allege: (1) the time, place, and contents of the [transfer]; (2) the identity of the person making the [transfer]; and (3) what the person intended to gain by making the[transfer].").

[125] *JPMorgan Chase Bank, N.A. v. Ballard*, 213 A.3d 1211, 1245 (Del. Ch. 2019) ([T]o state a fraudulent transfer claim, [the plaintiff] must generally plead facts showing intent to defraud with specific supporting facts describing the circumstances of the transfer."); *see also Winner Acceptance*, 2008 WL 5352063, at *7 ("State of mind . . . may be averred generally.").

[126] *See* Am. Compl. ¶¶ 45-66.

[127] *Kibler v. Wooters*, 2007 WL 1756595, at *4 (Del. Ch. June 6, 2007).  The factors include whether: "(1) The transfer or obligation was to an insider; (2) The debtor retained possession or control of the property transferred after the transfer; (3) The transfer or obligation was disclosed or concealed; (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) The transfer was of substantially all the debtor's assets; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the

26

without the presence of all of them, is generally sufficient to support a conclusion that one acted with the actual intent to defraud."[128]   The allegations serving as "badges of fraud"[129] that support several of the Section 1304(b) factors include:

- The transfer was made by one insider (Boomerang) to another insider (PTC Liberty), insofar as both entities are ultimately owned and controlled by Black Diamond.[130]

- The transfer was concealed.  Bids for the sale were accepted over a ten-day period from Christmas Eve of 2020 to January 3, 2021—a suspiciously fast turnaround during the winter holidays.[131]

- The transfer was of substantially all Boomerang assets.[132]

---

obligation was incurred; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."  6 *Del. C.* § 1304(b).

[128] *Kibler*, 2007 WL 1756595, at *4.

[129] *See Paul Elton*, 2020 WL 2203708, at *10 (describing "badges of fraud" as "a phrase that generally refers to circumstances that would allow a court to find (or, at the pleading stage, infer) the intent required to support a claim of fraud").

[130] Am. Compl. ¶¶ 23-26, 56, 75, 79-80, 100, 110; *see* 6 *Del. C.* § 1304(b)(1).

[131] Am. Compl. ¶¶ 50-53; *see* 6 *Del. C.* § 1304(b)(3).  The defendants maintain that the notice was compliant with New York UCC Section 9-611(b) and that Boomerang was not entitled to notice. *See* Def. Black Diamond Capital Management, L.L.C.'s Mot. to Dismiss Br. (Dkt. 7).  That argument may carry weight later in the case but is not determinative now when multiple badges of fraud are sufficiently pleaded.  *See SungChang Interfashion Co., Ltd. v. Stone Mountain Accessories, Inc.*, 2013 WL 5366373, at *9 (S.D.N.Y. Sept. 25, 2013) (denying a motion to dismiss an actual fraudulent transfer claim where "notice of the public auction was statutorily sufficient" because multiple badges of fraud were alleged, including "unusual timing" and "that creditors were not informed of a sale allegedly involving some of their assets").

[132] Am. Compl. ¶ 73; *see* 6 *Del. C.* § 1304(b)(5).  As noted below, the Complaint does not provide that "all" assets were transferred. *See infra* note 162 and accompanying text.

27

- The transfer occurred less than two months after ArcelorMittal issued its last invoice to Boomerang, which put Boomerang more than $7 million in debt.[133]

- Boomerang was insolvent at the time of the sale or became insolvent shortly afterward.[134]

- The assets sold were worth over $100 million but purchased by PTC Liberty for $16.5 million.[135]

PTC Liberty argues that these allegations of fraudulent intent are deficient because they are keyed to Black Diamond (or Black Diamond Commercial Finance) rather than Boomerang.[136] In PTC Liberty's view, "unless alter ego [liability] applies . . . Black Diamond's intent cannot be imputed to Boomerang."[137] No authority is cited for this proposition. This conclusory argument raises a thorny (and seemingly novel) question: can fraudulent intent be imputed from one entity to another absent alter ego liability?

Because I conclude that Cleveland-Cliffs has generally pleaded facts showing Boomerang's intent, I need not definitively resolve this question today. Nevertheless, I pause on it since PTC Liberty seems to think it is a slam dunk. I tend

---

[133] Am. Compl. ¶¶ 32, 54; *see* 6 *Del. C.* § 1304(b)(10). The last invoice was dated November 6, 2020, and the foreclosure sale was noticed on December 24, 2020. Am. Compl. ¶¶ 32, 46.

[134] Am. Compl. ¶ 67; *see* 6 *Del. C.* § 1304(b)(9).

[135] Am. Compl. ¶ 64; *see* 6 *Del. C.* § 1304(b)(8).

[136] PTC Liberty's Opening Br. 19; *see* Hr'g Tr. 61-63.

[137] PTC Liberty's Opening Br. 19.

28

to disagree. There are subtle—yet crucial—differences between the relevant doctrines that suggest the imputation of one entity's fraudulent intent to another is not foreclosed solely because they are not alter egos.

Veil piercing on an alter ego theory requires entities to be functionally one in the same.[138] But several of the factors Delaware courts consider when assessing alter ego liability (such as solvency, adequate capitalization, or observation of corporate formalities) have little bearing on the issues of control central to the imputation inquiry. For a fraudulent conveyance claim, the actual fraudulent intent of an entity exercising control over a transferor may be imputed to the transferor.[139] The imputation inquiry—at least in the bankruptcy context—can also look to the intent of the controller's officers and directors who caused the transfer.[140]

---

[138] *See Sunstates*, 788 A.2d at 534; *supra* Section II.A.1.

[139] *U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*, 817 F. Supp. 2d 934, 941 (N.D. Tex. 2011) ("Most courts recognize that when a transferee is in a position to dominate or control the debtor's disposition of . . . property, the transferee's intent to hinder, delay, or defraud will be imputed to the debtor/transferor." (quoting *ASARCO LLC v. Americas Mining Corporation*, 396 B.R. 278, 369 (S.D. Tex. 2008))). In *Verizon*, the plaintiff alleged that the parent corporation "used its control" over three of its subsidiaries to effectuate fraudulent transfers to two of its other subsidiaries. *Verizon*, 817 F. Supp. 2d at 940-41. Applying the imputed intent doctrine, the court held that the parent's control over the transferor subsidiaries was sufficient to impute the parent's actual fraudulent intent to the transferors and denied a motion to dismiss. *Id.* at 941-42.

[140] *See In re Syntax-Brillian Corp.*, 2016 WL 1165634, at *6 (Bankr. D. Del. Feb. 8, 2016) ("[F]or the purpose of recovering impermissibly transferred corporate assets and thereby facilitating creditor recovery, the intent of the officers and directors may be imputed to the corporation." (quoting *In re Nat'l Audit Def. Network*, 367 B.R. 207, 220 (Bankr. D. Nev. 2007))); *Verizon*, 817 F. Supp. 2d at 942; *In re Trib. Co. Fraudulent Conv. Litig.*, 2017 WL 82391, at *5 (S.D.N.Y. Jan. 6, 2017) ("Because all corporations must act through agents,

Here, Black Diamond allegedly controlled the transferor and the administrative agent that ran the foreclosure sale. Cleveland-Cliffs has alleged badges of fraud casting suspicion on the circumstances and timing of the sale—some of which pertain to Black Diamond's involvement. To the extent that the imputation of intent from Black Diamond to Boomerang is necessary for Cleveland-Cliffs' claim to survive (it is not), these facts arguably support a reasonable inference that Black Diamond controlled the sale to effectuate the transfer of Boomerang's assets to PTC Liberty.[141]

The motion to dismiss is therefore denied as to the actual fraudulent transfer claim against PTC Liberty.[142]

### 4. Transfer Beneficiary

Finally, Cleveland-Cliffs seeks relief under DUFTA from Black Diamond, which was not a party to the sale.[143] Section 1308(b)(1) allows a creditor to recover

---

courts assessing the intent of a corporation in a fraudulent conveyance claim will look to the intent of the corporate actors who effectuated the transaction on behalf of the corporation."), *aff'd*, 10 F.4th 147 (2d Cir. 2021).

[141] *See In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 447 (S.D.N.Y. 2001) ("[B]y virtue of the common relationship to both sides of the disposition, the wrongful intent embodied in the controlling transferee may be presumed to flow on to the debtor-transferor as the property passes, for all practical purposes, from one hand to the other of the same person, ending with the intended transferee.").

[142] The claim likewise survives against Boomerang.

[143] *See* Am. Compl. ¶ 101 ("The transfer of assets by Boomerang to PTC Liberty constitutes a fraudulent transfer[.]").

on a fraudulent transfer claim against "[t]he first transferee of the asset or the person for whose benefit the transfer was made."[144] Cleveland-Cliffs argues the latter—that Black Diamond was a transfer beneficiary.[145]

Delaware courts have applied a three-factor test used by bankruptcy courts to detect beneficiary status: "(1) whether the benefit was received by the beneficiary; (2) whether the benefit is quantifiable; and (3) whether the benefit is 'accessible to the beneficiary.'"[146] This case hinges on the first and third factors. Cleveland-Cliffs

---

[144] 6 *Del. C.* § 1308(b)(1). Delaware courts have construed the remedial provisions of the statute narrowly and rejected attempts to create secondary liability. *See Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 203 (Del. Ch. 2006) ("Despite the breadth of remedies available under state and federal fraudulent conveyance statutes, those laws have not been interpreted as creating a cause of action for 'aiding and abetting.' Rather, as [] both the defendants and the Litigation Trust agree, the only proper defendants in a fraudulent conveyance action under federal bankruptcy law or Delaware law are the transferor and any transferees."), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007) (TABLE); *see also Edgewater Growth Cap. P'rs, L.P. v. H.I.G. Cap., Inc.*, 2010 WL 720150, at *2 (Del. Ch. Mar. 3, 2010) (rejecting a claim for fraudulent transfer where the directors were alleged to have "conspired with [the transferees] to cause the transfer to occur").

[145] Cleveland-Cliffs does not argue that Black Diamond is the "first" or "initial" transferee. "[A] 'transferee' has 'dominion over the money or other asset, the right to put the money to one's own purposes.' The 'initial' transferee is the first entity to have such a dominion or right." *In re Hansen*, 341 B.R. 638, 643 (Bankr. N.D. Ill. 2006) (quoting *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890 (7th Cir. 1988); citing *In re Ausman Jewelers, Inc.*, 177 B.R. 282, 286 (Bankr. W.D. Wis. 1995)).

[146] *Humanigen, Inc. v. Savant Neglected Diseases, LLC*, 2021 WL 4344172, at *16 (Del. Super. Sept. 23, 2021) ("To detect beneficiary status, this Court engages the same three-factor test bankruptcy courts use.").

31

contends that Black Diamond's alleged ownership and control of PTC Liberty is sufficient to satisfy them.[147]

In support of this argument, Cleveland-Cliffs relies on *In re McCook Metals, L.L.C.*—a decision by the United States District Court for the Northern District of Illinois.[148]  There, the court interpreted transfer beneficiary language in the Bankruptcy Code as permitting a fraudulent transfer claim against an individual controller of an LLC that received contract rights through a challenged transaction.[149]  The court reasoned that the defendant "received an actual benefit [through] his share of the value of the assets" and that the benefit was accessible to him "through [his] control of [the transferee]."[150]

The approach taken in *McCook* has (rightly) been criticized.  One year after *McCook* was issued, the Northern District of Illinois opined that: "The problem with *McCook* and the few other decisions authorizing this sort of status-based recovery is that they ignore the fundamental nature of corporations.  . . .  [A] corporation is a legal entity separate from its shareholders, officers, and directors."[151]  In another decision, the court observed that because *McCook* "does not define 'control,'" it

[147] Pls.' Answering Br. 34.

[148] 319 B.R. 570 (N.D. Ill. 2005).

[149] *Id.* at 590-92.

[150] *Id.* at 592.

[151] *Hansen*, 341 B.R. at 645.

"renders every majority shareholder of a closely-held corporation . . . liable for transfers to the corporation, although the corporation is entirely legitimate and all corporate formalities have been carefully observed."[152]

To follow *McCook* and adopt Cleveland-Cliffs' reasoning would be inconsistent with Delaware's policy of safeguarding corporate separateness.[153] Courts have widely rejected attempts to pursue fraudulent transfer claims using similar logic.[154]  Having rejected Cleveland-Cliffs' attempt to pierce the corporate

---

[152] *In re Delta Phones, Inc.*, 2005 WL 3542667, at *10 n.4 (Bankr. N.D. Ill. Dec. 23, 2005).

[153] *See, e.g., All. Data Sys. Corp.*, 963 A.2d 746, 769 (Del. Ch. 2009) ("Delaware law respects corporate formalities, absent a basis for veil-piercing, recognizing that the wealth-generating potential of corporate and other limited liability entities would be stymied if it did otherwise."); *see also Nieves*, 2020 WL 4463425, at *8 ("Delaware law presumes respect for the corporate form: A subsidiary corporation is presumed to be a separate and distinct entity from its parent corporation.") (cleaned up).  As noted above, however, it is at least arguable that intent is imputable absent alter ego liability.  *See supra* notes 138-41 and accompanying text.

[154] *See Yu v. GSM Nation, LLC*, 2018 WL 2272708, at *13 (Del. Super. Apr. 24, 2018) (dismissing a fraudulent transfer claim against a defendant who allegedly controlled the transferor and transferee because the claim "read[] like an attempt to pierce the corporate veil"); *see also In re Brown Publ'g Co.*, 2015 WL 1009177, at *7-8 (Bankr. E.D.N.Y. Mar. 4, 2015) (collecting cases and observing that "[t]he majority of cases addressing this issue have held that a shareholder in a corporation which receives the benefit of a fraudulent transfer is not personally liable" under the transfer statute); *In re Harris Agency, LLC*, 477 B.R. 590, 593 n.3 (Bankr. E.D. Pa. 2012) ("[T]he Trustee has merely stated that the Moving Defendants are in control and directed the actions of the Entity Defendants. This does not necessarily mean that the alleged transfers benefitted them and is, therefore, an insufficient factual allegation to survive a motion to dismiss."); *In re Green Field Energy Servs., Inc.*, 2018 WL 1116374, at *3 (Bankr. D. Del. Feb. 27, 2018) ("Control of an entity is not enough to show access to the benefit.  The party must show that there was actual access."); *In re Imageset, Inc.*, 299 B.R. 709, 718 (Bankr. D. Me. 2003) ("[T]he individuals' rights as interest holders in the LLC is not alone sufficient to qualify them as persons 'for whose benefit [the] transfer[s were] made' within § 550(a)(1)'s meaning."); *Sher v. SAF Fin., Inc.*, 2011 WL 4835700, at *2 (D. Md. Oct. 11, 2011) ("[A] shareholder may not be held liable

33

veil, I decline to extend liability to Black Diamond—a stockholder that allegedly benefitted from a fraudulent transfer to the entity. To the extent that such liability is even legally possible under Delaware law, it fails here given the absence of well-pleaded allegations suggesting that Black Diamond was a transfer beneficiary. The fraudulent transfer claim against Black Diamond is dismissed.

## C.    Successor Liability

In Count I of the Complaint, Cleveland-Cliffs claims that PTC Liberty bears successor liability for the Unpaid Invoices since it "acquired substantially all of Boomerang's assets."[155] "In Delaware, when one company sells or otherwise transfers all of its assets to another company, the buyer generally is not responsible for the seller's liabilities, including claims arising out of the seller's tortious conduct."[156] "Exceptions include: (1) the buyer's assumption of liability; (2) defacto

---

without a showing that he had actually received distributions of the transferred property or unless 'a showing can be made to pierce the corporate veil.'" (quoting *Hansen*, 341 B.R. at 646)).

[155] Am. Compl. ¶¶ 90-91. This claim was initially also brought against Black Diamond but abandoned. *See* Hr'g Tr. 56-57. It would fail in any event because Black Diamond is not alleged to have bought any assets from Boomerang. *See Spring Real Est., LLC v. Echo/RT Hldgs., LLC*, 2013 WL 6916277, at *4 (Del. Ch. Dec. 31, 2013) (recognizing successor liability as to a "purchaser of assets").

[156] *Ross v. Desa Hldgs. Corp.*, 2008 WL 4899226, at *4 (Del. Super. Sept. 30, 2008). Originally, the Cleveland-Cliffs argued that New York law should apply to the successor liability claim. At oral argument, it conceded that Delaware law applies, consistent with the defendants' position. Hr'g Tr. 57-58. This concession was apt. *See Xperex Corp. v. Viasystems Techs. Corp., LLC*, 2004 WL 3053649, at *2 (Del. Ch. July 22, 2004) ("Whether or not a Delaware corporation is liable for the conduct of another corporation is a question of Delaware law."); *see also Energy Intel. Grp., Inc. v. Cowen & Co., LLC*, 2016

merger or consolidation; (3) mere continuation of the predecessor under a different name; or (4) fraud."[157]   Under the APA, PTC Liberty expressly disclaimed "responsib[ility] for any liabilities or obligations of [Boomerang]."[158]   That leaves three potential exceptions.  Cleveland-Cliffs has invoked two, asserting that "PTC Liberty is merely a continuation of Boomerang and/or a de facto merger occurred."[159]

### 1.   De Facto Merger

"The elements necessary to create a de facto merger under Delaware law are the following: (1) one corporation transfers all of its assets to another corporation; (2) payment is made in stock, issued by the transferee directly to the shareholders of the transferring corporation; and (3) in exchange for their stock in that corporation, the transferee agreeing to assume all the debts and liabilities of the transferor."[160]

---

WL 3939747, at *11 (S.D.N.Y. July 15, 2016) (applying the law of the state of incorporation to a successor liability claim); Restatement (Second) of Conflict of Laws § 302 (1971).

[157] *Ross*, 2008 WL 4899226, at *4.

[158] APA § I.2.

[159] Am. Compl. ¶ 94.  It is not apparent whether Cleveland-Cliffs seeks to invoke the fraud exception.  Given my analysis of the fraudulent transfer claims, it arguably applies.  To the extent that the mere continuation exception cannot support the claim, it could survive on this basis.

[160] *Magnolia's at Bethany, LLC v. Artesian Consulting Engineers, Inc.*, 2011 WL 4826106, at *3 (Del. Super. Sept. 19, 2011).

None of these elements are met.[161] The allegation that Boomerang transferred all of its assets is belied by APA's terms, which provide for certain exclusions.[162] Further, PTC Liberty paid for the assets in cash and expressly disclaimed the assumption of Boomerang's liabilities.[163]

### 2. Mere Continuation

The mere continuation exception requires that "the purchaser of the assets to be a continuation of 'the same legal entity,' not just a continuation of the same business in which the seller of the assets engaged."[164] "The 'primary elements' of being the same legal entity have been said to include 'the common identity of the

---

[161] *See Spring Real Est.*, 2013 WL 6916277, at *5 (dismissing successor liability claim arising out of asset purchase agreement); *Magnolia's at Bethany*, 2011 WL 4826106, at *2-3 (same); *Marnavi S.p.A. v. Keehan*, 900 F. Supp. 2d 377, 397 (D. Del. 2012) (same); *but see Xperex*, 2004 WL 3053649, at *2.

[162] Excluded assets included all real estate, certain equipment, and certain equity interests. APA § I.1(a); *id.* Ex. B.

[163] APA §§ I.2, I.3; *id.* Ex. C ("Buyer shall not assume or become responsible for any liabilities or obligations of the Grantors or any of its Affiliates . . . . The consideration payable at the Closing (the "Purchase Price") shall be $16,500,000[.]"); *see Energy Intel. Grp.*, 2016 WL 3939747, at *10 (S.D.N.Y. July 15, 2016) (observing a difference between New York and Delaware law in assessing a de facto merger because "the elements of a de facto merger in Delaware are clearly more rigorous: they require a transfer of all of the transferor's assets and an assumption of all its liabilities, in exchange for a payment made in the stock of the transferee directly to the shareholders of the transferor").

[164] *Spring Real Est.*, 2013 WL 6916277, at *5; *see Mason v. Network of Wilm., Inc.*, 2005 WL 1653954, at *5 (Del. Ch. July 1, 2005) (explaining that "the doctrine of successor liability . . . involves asset purchasers or, perhaps, the entity that picks up the business of the entity burdened (or likely to be burdened) by the creditor's claim").

officers, directors, or stockholders of the predecessor and successor corporations, and the existence of only one corporation at the completion of the transfer.'"[165]

Although Delaware courts have construed this theory "very narrowly,"[166] the Complaint supports its application here. Cleveland-Cliffs alleges that PTC Liberty—like Boomerang—"remains under the ownership and control of Black Diamond and its affiliates."[167] It asserts that Boomerang effectively ceased to exist after the Article 9 sale and was replaced by PTC Liberty—which operates the same business, employs the same facilities, employees, and equipment, has a similar website, and sells to the same customers as Boomerang.[168] Cleveland-Cliffs also states that the "same Vice President of Sales, Chief Technical Officer, Plant Manager, Operations Manager, and Product Technology and Field Services Manager" employed by PTC Liberty once worked for Boomerang, among other

---

[165] *Id.* (quoting *Magnolia's at Bethany*, 2011 WL 4826106, at *3).

[166] *Spring Real Est.*, 2013 WL 6916277, at *5 (questioning whether the "continuation theory" finds support in our law given the absence of "explicit support in the precedent of the Supreme Court or this Court"); *see also Fehl v. S. W. C. Corp.*, 433 F. Supp. 939, 946 (D. Del. 1977) ("The continuation theory, which has rarely been raised, has been construed narrowly by the Delaware courts.").

[167] Am. Compl. ¶ 79.

[168] *Id.* ¶¶ 75-78.

"officers and employees."[169]   Taken together, these facts make it reasonably conceivable that PTC Liberty is a continuation of Boomerang.

PTC Liberty's arguments to the contrary would require me to draw inferences against Cleveland-Cliffs.  Specifically, PTC Liberty argues that Boomerang existed after the Article 9 sale because PTC Liberty did not purchase certain real property, stock and membership interests in other companies, and equipment.[170]  Still, it is reasonable to infer from the Complaint that Boomerang no longer exists as a going concern, has effectively been dissolved, and was replaced by PTC Liberty.[171]  The motion to dismiss Count I is therefore denied as to PTC Liberty.

---

[169] *Id.* ¶ 81 (alleging that PTC Liberty "continue[s] to employ many of the same officers and employees as Boomerang").

[170] PTC Liberty's Opening Br. 16, 25-26.

[171] *See AJZN, Inc. v. Yu*, 2015 WL 331937, at *15-16 (D. Del. Jan. 26, 2015) (denying a motion to dismiss a successor liability claim based on the mere continuation exception where the plaintiff alleged the successor "continued to conduct the same business as [the prior company], using the same assets, domain name and websites, and retaining most employees . . . [and] held itself out to the public as a continuation of the business"); *see also Simple Glob., Inc. v. Brathwait Watches, Inc.*, 2022 WL 100363, at *3 (Del. Super. Jan. 10, 2022) (denying a motion for summary judgment where the successor "fill[ed] the same role" in selling products "once filled by" the prior company, the two used the same website, and it seemed that "a relationship of some degree exists, or existed"); *see generally SungChang Interfashion*, 2013 WL 5366373, at *15-16 (applying New York law, which the court observed was substantively identical to Delaware law, and denying a motion to dismiss a successor liability claim where the plaintiff alleged the prior company engaged in a fraudulent conveyance and was functionally insolvent, that the successor company was in the same line of business and operated in the same location as the prior company, and that the same individual served as president of both companies).

## D. Unjust Enrichment

Count V is a claim for unjust enrichment brought in the alternative against Boomerang, PTC Liberty, and Black Diamond.[172] To prevail on an unjust enrichment claim, a plaintiff "must show an enrichment, an impoverishment, a relation between the enrichment and impoverishment, and the absence of justification."[173] "Of cardinal significance is whether a contract already governs the parties' relationship."[174] If so, the contract is "the measure of [the] plaintiff's right."[175]

Here, Cleveland-Cliffs alleges that its relationship with Boomerang was governed by the Terms & Conditions Agreement and brings a claim against Boomerang for breaching that contract.[176] The Complaint makes clear that the issues underlying the unjust enrichment claim against PTC Liberty and Black Diamond are

---

[172] Am. Compl. ¶¶ 122-27.

[173] *Laidlaw v. GigAcquisitions2, LLC*, 2023 WL 2292488, at *14 (Del. Ch. Mar. 1, 2023); *see also Garfield ex rel. ODP Corp. v. Allen*, 277 A.3d 296, 351 (Del. Ch. 2022).

[174] *MetCap Secs. LLC v. Pearl Senior Care, Inc.*, 2007 WL 1498989, at *5 (Del. Ch. May 16, 2007).

[175] *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del. 1979); *see also Choupak v. Rivkin*, 2015 WL 1589610, at *20 (Del. Ch. Apr. 6, 2015) (dismissing an unjust enrichment claim because the parties' agreements "established the measure of [the plaintiff's] rights"), *aff'd*, 129 A.3d 232 (Del. 2015) (TABLE).

[176] Am. Compl. ¶ 33 ("Boomerang's purchases pursuant to the Invoices were governed by a certain Terms & Conditions of Sale[.]").

the same raised in the breach of contract claim against Boomerang.[177]  For example, Cleveland-Cliffs alleges that "it would be inequitable for [the defendants] to retain the benefits conferred by ArcelorMittal without full payment to ArcelorMittal's successor-in-interest, Cleveland-Cliffs, for the value of those benefits."[178]  The unjust enrichment complained of is the defendants' purported receipt of "the benefit of the products provided without reimbursing Cleveland-Cliffs."[179]  Cleveland-Cliffs cannot circumvent the terms of the Terms & Conditions Agreement by claiming that non-parties to the contract (Black Diamond and PTC Liberty) were unjustly enriched.[180]

Cleveland-Cliffs argues that the unjust enrichment claim should survive because "it is unknown whether Boomerang, which has not appeared yet, will challenge the [Terms & Conditions Agreement's] validity."[181]  That argument is

---

[177] *Id.* ¶ 31; *see Albert v. Alex. Brown Mgmt. Servs.*, 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005) (dismissing an unjust enrichment claim where it was "undisputed that a written contract existed between" the parties and "the plaintiffs specifically brought claims based on these contracts").

[178] Am. Compl. ¶ 125.

[179] *Id.* ¶ 126.

[180] *Tygon Peak Cap. Mgmt., LLC v. Mobil Invs. Investco, LLC*, 2022 WL 34688, at *15 (Del. Ch. Jan. 4, 2022) ("It is well settled that [a plaintiff] may not use a claim for unjust enrichment 'to circumvent basic contract principles recognizing that a person not a party to a contract cannot be held liable to it.'" (quoting *MetCap Secs.*, 2007 WL 1498989, at *6), *reargument granted in part*, 2022 WL 414399 (Del. Ch. Feb. 10, 2022).

[181] Pls.' Answering Br. 50 (citing *Lyons Ins. Agency, Inc. v. Kirtley*, 2019 WL 1244605, at *2 (Del. Super. Mar. 18, 2019) and non-Delaware precedent applying other states' laws).

entirely hypothetical. Unlike the precedent Cleveland-Cliffs relies on, there is no live dispute about "the validity and enforceability" of the contract.[182] Cleveland-Cliffs acknowledges that the Terms & Conditions Agreement is enforceable.[183]

In any event, Cleveland-Cliffs has failed to support the elements of an unjust enrichment claim. For example, there are no well-pleaded allegations that Black Diamond was "enriched" by the Article 9 sale. Nor can "some direct relationship"[184] between the defendants' purported enrichment (acquiring assets for less than fair value) and Cleveland-Cliffs' impoverishment (the inability, as an unsecured creditor of Boomerang, to collect on debts) be reasonably inferred.

Thus, Count V is dismissed against PTC Liberty and Black Diamond.[185]

## E.    Declaratory Judgment

Finally, in Count VI, Cleveland Cliffs requests a declaration that the Article 9 sale was not commercially reasonable and therefore noncompliant with the New

---

[182] *Lyons*, 2019 WL 1244605, at *2.

[183] Pls.' Answering Br. 50 ("Cliffs has alleged an enforceable agreement with Boomerang."). Moreover, Boomerang has defaulted, waiving its right to assert affirmative defenses. Am. Compl. ¶¶ 13, 70, 88; *cf. Chewning v. JPMorgan Chase Bank*, 133 A.3d 971 (Del. 2016) ("To the extent that the [appellants] are now attempting to offer a defense to the foreclosure action, they waived any such defenses by failing to appear and file an answer to the complaint.").

[184] *MetCap Secs.*, 2007 WL 1498989, at *5.

[185] I cannot dismiss the claim against Boomerang since it has not moved for dismissal and is in default.

York UCC.[186]  But Cleveland-Cliffs lacks standing to challenge the Article 9 sale under the New York statute.  Article 9 Section 625 of the New York UCC provides a cause of action only to a debtor, an obligor, or a secured creditor.[187]  Cleveland-Cliffs concedes that it is none of these; it was a contract creditor of Boomerang that does not claim any security interest.[188]

Cleveland-Cliffs insists that it can nonetheless ask this court to decide whether it would prevail on a statutory claim under Article 9 if it theoretically had standing. This is proper, it argues, because the defendants raised the sale's compliance with Article 9 when moving to dismiss the original complaint.[189]  But if Cleveland-Cliffs wants to show that the Article 9 sale was noncompliant to defeat a defense, it can litigate the issue as such.  It is neither necessary nor appropriate to bring an

---

[186] Am. Compl. ¶ 131.

[187] N.Y. U.C.C. Law § 9-625 (McKinney) ("Persons entitled to recover damages; statutory damages if collateral is consumer goods.  Except as otherwise provided in Section 9-628: (1) a person that, at the time of the failure, was a debtor, was an obligor, or held a security interest in or other lien on the collateral may recover damages under subsection (b) for its loss.").

[188] Pls.' Answering Br. 15; *see also Opacmare USA, LLC v. Lazzara Custom Yachts, LLC*, 314 F. Supp. 3d 1276, 1282 (M.D. Fla. 2018) ("Article 9 does not afford . . . an unsecured creditor . . . a statutory basis to challenge the sale or set aside the sale.") (citation omitted); *iFlex Inc. v. Electroply, Inc.*, 2004 WL 502179, at *3 (D. Minn. Mar. 4, 2004) (concluding that an unsecured creditor lacked standing to challenge the fair market value or commercial reasonableness of an Article 9 sale); *Burton v. Hardwood Pallets, Inc.*, 2001 WL 1589162, at *5 (Tenn. Ct. App. Dec. 13, 2001) ("As unsecured creditors, [plaintiffs] have no interest in the collateral.  As such, they were not entitled to notice of the sale, and they have no standing to challenge the manner in which it was sold.") (citation omitted).

[189] Pls.' Answering Br. 14-15.

affirmative claim to rebut a defense—much less one that neither defendant is presently asserting. I decline to issue an advisory opinion on a New York statute that does not give Cleveland-Cliffs a key to the courthouse door.[190]

## III. CONCLUSION

For the foregoing reasons, Black Diamond's motion to dismiss is granted and PTC Liberty's motion to dismiss is granted in part and denied in part. Counts I, II, III, V, and VI are dismissed with prejudice as to Black Diamond. Counts III, V, and VI are dismissed with prejudice as to PTC Liberty. Counts I and II as brought against PTC Liberty survive.

Within ten days, the parties shall submit a proposed order to implement this decision. Additionally, within thirty days, Cleveland-Cliffs shall inform the court by letter how it intends to proceed as to Boomerang.

---

[190] *See generally In re Merrill Lynch & Co., Inc. Secs., Deriv. & ERISA Litig.*, 597 F. Supp. 2d 427, 431 (S.D.N.Y. 2009) ("Standing is the key to the courthouse door; those who possess the key, possess power.").